**UNITED STATES of America**

v.

**James F. BOYLAN.**

**Criminal No. 98–45.**

United States District Court,
D. New Jersey.

May 8, 1998.

Faith S. Hochberg, United States Attorney, Ralph J. Marra, Jr., Assistant United States Attorney, Newark, NJ, for U.S.

Michael Critchley, Michael Critchley & Associates, West Orange, NJ, for Defendant, James F. Boylan.

## OPINION

ORLOFSKY, District Judge.

This case concerns a former Jersey City Municipal Court judge who coached female defendants charged with traffic violations to lie in open court about the circumstances of their offenses, based reductions of their traffic fines and penalties on the false statements he procured, and, in turn, solicited sexual favors from these hapless women over a period of approximately three years. This former judge, now a defendant before this Court, has asked that he be sentenced as if his conduct caused nothing more than a financial loss to the City of Jersey City. Under the circumstances, however, the Court cannot do so without violence to the Sentencing Guidelines.

In order to ascertain the applicable guideline range for Defendant, James F. Boylan ("Boylan"), I must resolve several issues raised by the objections of Boylan and the Government to the Presentence Investigation Report (the "PSI").[1] In particular, I must decide whether to apply U.S.S.G. § 2F1.1, the offense guideline section associated with fraud, or U.S.S.G. § 2C1.7, the offense guideline section associated with fraud involving deprivation of the intangible right to the honest services of public officials. If the "honest services" fraud section of the Guidelines applies, I must determine whether the 8–level adjustment for an offense involving

certain categories of officials applies. I must also decide whether either of the victim-related adjustments in U.S.S.G. § 3A1.1 applies and whether an adjustment based upon an abuse of a position of trust or the use of a special skill, as provided for in U.S.S.G. § 3B1.3, applies. Finally, I must determine whether and to what extent a fine should be imposed on Boylan. I will address each of these issues in turn.

## I. Discussion

### A. Applicable Offense Guideline

#### 1. General Principles in Choosing Offense Guideline Section

██ The first step in the application of the Sentencing Guidelines is to consult U.S.S.G. § 1B1.2, which provides that the Court should:

> Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.,* the offense conduct charged in the count of the indictment or information of which the defendant was convicted). *Provided,* however, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two most applicable to the stipulated offense.

U.S.S.G. § 1B1.2(a). Generally, the Court looks to the guidelines section which corresponds to the offense of conviction as set forth in Appendix A to the Sentencing Guidelines. *See* U.S.S.G. App. A; U.S.S.G. 1B1.2 comment. (n.1).

"When a particular statute proscribes a variety of conduct that might constitute the subject of different offense guidelines, the [C]ourt will determine which guideline section applies based upon the nature of the offense charged in the count of which the defendant was convicted." *Id.* The only exception to this rule is "[w]here a stipulation that is set forth in a written plea agreement

---

1. In considering the PSI, I have considered the two formal addenda, dated April 13, 1998, and April 24, 1998, as well as the amended pages 14

and 15 which were faxed to the Court, the Government, and Boylan on May 7, 1998.

or made between the parties on the record during a plea proceeding establishes facts that prove a more serious offense or offenses than the offense or offenses of conviction." *Id.* In such a case, the Court "is to apply the guideline most applicable to the more serious offense or offenses established." *Id.*

Accordingly, I must decide which guideline section applies based upon the nature of the conduct charged in the Information, and then decide if the limited exception applies. In doing so, I look only to the nature of the charged conduct, a subset of information which is likely to be narrower than "relevant conduct" as defined in section 1B1.3. *See United States v. Centner,* 116 F.3d 473, 1997 WL 328766, *3 n. 4 (4th Cir. June 17, 1997) (noting that "when a defendant has pled guilty, the court can only base its choice of guideline on the offense of conviction, facts alleged in the information or indictment, and formal stipulations to facts establishing a more severe offense" and citing *United States v. McCall,* 915 F.2d 811, 815 (2d Cir. 1990)); *United States v. Street,* 66 F.3d 969, 979 (8th Cir.1995) (holding that "[u]nder [section] 1B1.2(a) the court determines which guideline is most applicable to the 'offense of conviction' " and therefore, court "selects the guideline solely by 'conduct charged in the count of the indictment or information of which the defendant was convicted' "); *United States v. Carroll,* 3 F.3d 98, 101 (4th Cir.1993); *United States v. Lambert,* 994 F.2d 1088, 1092 (4th Cir.1993) ("actual conduct remains relevant in the consideration of offense characteristics *after a guideline has been chosen,* in the consideration of various adjustments, and in the consideration of conduct-related departures, but the district court erred in permitting a subjective assessment of the conduct's seriousness to affect its initial choice of guideline") (emphasis added); *see, e.g., United States v. McHugh,* 122 F.3d 153, 158 (2d Cir.1997) (Newman, J., concurring) ("The information narrowed the charged offense, and once [the defendant] pled guilty to counts charging 'criminal negligence,' that became the 'offense conduct' that the Guidelines instruct is to be used to determine the applicable sentencing guideline."); *United States v. Terry,* 86 F.3d 353, 358 (4th Cir.1996) ("the district court's primary error

in *Lambert* was that, in an effort to determine the true nature and gravity of the defendant's crime, it looked outside the conduct *described in the indictment* ") (emphasis added).

## 2. The Plea and the Conduct Charged in the Information

The conduct charged in the Information is essentially this: Boylan was a municipal court judge for the City of Jersey City and presided over cases involving violations of motor vehicle and traffic laws. Information at ¶ 1 (dated Jan. 23, 1998). During a period of approximately three years, from sometime in 1994 until October 1997, Boylan, in his capacity as a municipal court judge, "reduced traffic violation fines and penalties ... for female municipal court defendants and coached these defendants to lie in open court about the circumstances of their traffic tickets in order to create an official record in support of the reductions." *Id.* at ¶ 4. In connection "with the fine and penalty reductions," Boylan "would solicit sexual favors from the municipal court defendants." *Id.* at ¶ 5. The object of this scheme "was to obtain things of value for [Boylan's] benefit and to deprive the City of Jersey City, citizens of Jersey City and municipal court defendants of money or property." *Id.* at ¶ 3. The only "things of value" benefitting Boylan which can reasonably be inferred from the Information are the sexual favors which he solicited from the female municipal court defendants whom he had coached to lie about the circumstances of their offenses and for whom he had reduced fines and penalties. The Information charged Boylan with one count of wire fraud in violation of 18 U.S.C. § 1343.

On or after November 7, 1997, Boylan and the Government entered into a plea agreement which provided that Boylan would allocute to the following factual basis:

From in or about 1994 through about October 1997 [Boylan] engaged in a scheme as a municipal court judge whereby he solicited sexual favors from citizens who appeared before him in connection with reducing their fines. He further counseled them to lie about the circumstances of their traffic tickets in order to support

their reductions. He used the mails and wires to further the scheme.

Plea Agreement, Sch. A at ¶ 5 (dated Nov. 7, 1997).

As part of the guilty plea, on January 23, 1998, Boylan admitted under oath the following facts, *inter alia,* in a colloquy with the Court:

> The Court: Beginning in about 1994, did you engage in a scheme to defraud the City of Jersey City, the citizens of Jersey [C]ity and Municipal Court defendants of money or property?
>
> The Defendant: Yes, your Honor.
>
> The Court: As part of that scheme, while presiding over Municipal Court sessions, did you reduce traffic violation fines and penalties for female Municipal Court defendants?
>
> The Defendant: Yes, your Honor.
>
> The Court: As part of the scheme, did you coach these Municipal Court defendants to lie in open court about the circumstances of their traffic tickets?
>
> The Defendant: Yes, your Honor.
>
> The Court: Did you then use these false statements as a factual basis to justify your reductions in their fines and penalties?
>
> The Defendant: Yes, your Honor.
>
> The Court: As part of the scheme in connection with these fines and penalty reductions, did you solicit sexual favors from these Municipal Court defendants?
>
> The Defendant: Yes, your Honor.
>
> The Court: Between 1994 and October 1997, did you cause the [C]ity of Jersey City to lose over ten thousand dollars but less than [twenty] thousand dollars in fines and penalties as part of your scheme to defraud?
>
> The Defendant: Yes, your Honor.
>
> The Court: In or about August 1997, for the purpose of executing this scheme, did you cause a wire transmission to go from the New Jersey Department of Motor Vehicles in Trenton to a national register of driver's license revocations in Washington, D.C.?
>
> The Defendant: Yes, your Honor.
>
> The Court: Did the transmission relate to the driver's license status of one of the Municipal Court defendants involved in the scheme as you explained it today?
>
> The Defendant: Yes, your Honor.
>
> The Court: After this wire transmission, did you meet with this Municipal Court defendant and solicit sexual favors from her?
>
> The Defendant: Yes, your Honor.
>
> The Court: Did you do all these acts knowingly and willfully?
>
> The Defendant: Yes, your Honor.
>
> The Court: Did you know what you were doing was wrong?
>
> The Defendant: Yes, your Honor.

Transcript 18–19 (dated Jan. 23, 1998).

### 3. Choosing Between Sections 2C1.7 and 2F1.1

Boylan and the Government agreed as part of the Plea Agreement that section 2F1.1, the offense guideline section associated with fraud, was the applicable offense guideline section. *See* Plea Agreement, Sch. A at ¶¶ 1–2. The Probation Department, however, in preparing the PSI chose section 2C1.7, the offense guideline section associated with fraud involving deprivation of the intangible right to honest services of public officials, as the appropriate offense guideline. *See* PSI at ¶ 19 & p.19. Boylan strenuously objects to the application of section 2C1.7 in this case. The Government has given no indication that it does not stand by the Plea Agreement.

I will apply section 2C1.7 rather than section 2F1.1 because section 2C1.7 is the guideline most applicable to the conduct charged in the Information. Furthermore, even if section 2C1.7 were not the most applicable guideline, the conduct to which Boylan pled guilty "specifically establishes," within the meaning of section 1B1.2(a), that Boylan deprived the citizens of Jersey City of their intangible rights to honest services, which is a violation of 18 U.S.C. § 1343 by the operation of 18 U.S.C. § 1346. Accordingly, the limited exception provided in section 1B1.2(a)

also mandates the application of section 2C1.7.[2]

In this case, as I have described in detail, *see* Part II.A.2, *supra*, Boylan pled guilty to a one-count information charging wire fraud, a violation of 18 U.S.C. § 1343. 18 U.S.C. § 1343 corresponds in Appendix A to both sections 2F1.1 and 2C1.7. *See* U.S.S.G.App. A; U.S.S.G. 1B1.2 comment. (n.1) (directing use of Appendix A); *see generally* Information at ¶¶ 1, 6. Thus, the choice of potentially applicable guidelines is narrowed considerably.[3]

While one consequence of Boylan's conduct was to inflict a financial loss on the City of Jersey City and its citizens—because some female municipal court defendants paid lower fines than they should have—a much more appropriate and realistic description of the conduct charged in the Information focuses on the relationship between Boylan and the female municipal court defendants. In exchange for coaching them to lie about the traffic violations with which they were charged, and, in turn, reducing the fines and penalties for their traffic violations, Boylan solicited the female municipal court defendants to engage in sexual relations with him. Boylan's systematic perversion and corruption of the judicial process in the Municipal Court surely deprived the citizens of Jersey City of their intangible right to the honest services of a municipal court judge. Boylan's actions also deprived the female municipal court defendants of their right to a fair trial before an impartial municipal court judge. In no sense, can a judge who coaches female defendants to lie in open court and improperly reduces fines and penalties imposed by law, in the hopes of gratifying his personal sexual desires, be said to be providing honest services to the citizens and litigants to whom he owes a duty of fairness and impartiality. Indeed, Boylan's conduct as charged in the Information violates, at the very least, Canons 1, 2, and 3 of the Code of Judicial Conduct as adopted by the New Jersey Supreme Court and applicable in relevant part to part-time judges such as municipal court judges. *See* N.J.Code of Judicial Conduct, Canons 1, 2, & 3 Applicability Note.[4]

The essence of Boylan's conduct was the perversion of justice. His conduct, as charged in the Information, deprived certain female municipal court defendants of their right to a fair trial before an impartial judge, and deprived the citizens of Jersey City of their right to his honest services, conduct most aptly embraced by section 2C1.7. The losses incurred by the City of Jersey City and its citizens are the incidental and secondary results of Boylan's conduct. He clearly intended by the "sale" of his judicial office to induce the female municipal court defendants to have sexual relations with him. Had this been a scheme primarily to defraud the City of Jersey City and others of money, Boylan would not have reduced the fines and penalties of women only, or would not have solicited sexual favors from those for whom he had reduced fines. *Cf. United States v. Rubin*, 999 F.2d 194, 197–98 (7th Cir.1993) (holding that defendants' fraudulent misrepresentations were incidental to price-fixing scheme, and that section 2R1.1, not 2F1.1, was applicable guideline). Thus, the conduct charged in the Information cannot fairly be

---

2. As I further describe below, "in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, [the Court should] determine the offense guideline section in Chapter Two most applicable to the stipulated offense." U.S.S.G. § 1B1.2(a). "For example, if the defendant pleads guilty to theft, but admits the elements of robbery as part of the plea agreement, the robbery guideline is to be applied." *Id.* at § 1B1.2, comment. (n.1).

3. Of course, "in an atypical case, the guideline section indicated for the statute of conviction [may be] inappropriate," in which case the court should "use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." *See* U.S.S.G.App. A, intro.

4. Canon 1 provides: "A judge should uphold the integrity and independence of the judiciary."

Canon 2 provides: "A judge should avoid impropriety and the appearance of impropriety in all activities."

Canon 3 provides: "A judge should perform the duties of judicial office impartially and diligently." *See also* Canon 5 ("A judge shall so conduct the judge's extra-judicial activities as to minimize the risk of conflict with judicial obligations.").

described as fraud involving the deprivation of honest services committed *for the purpose of facilitating* a financial fraud on the City of Jersey City and its citizens. *See* U.S.S.G. § 2C1.7(c)(1).[5]

Section 2C1.7, far more than section 2F1.1, is the guideline which is uniquely adapted to embrace all of the conduct charged in the Information. First, section 2C1.7 clearly contemplates that fraud by public officials may both deprive a constituency of its intangible right to honest services *and* have financial consequences. That is, section 2C1.7 lists as specific offense characteristics the situations where offense conduct causes a loss to the government or allows a pecuniary benefit to be improperly obtained, *and* the situation where the offense simply involves certain public officials. *See* U.S.S.G. § 2C1.7(b)(1). However, section 2F1.1 does not distinguish between a loss caused by an elected official or an official holding a high-level decision making or sensitive position, and a loss caused by a simple private actor. Furthermore, section 2F1.1 would not capture much of the offense conduct charged in the Information, in particular: that Boylan was a judge, Information at ¶ 1(b-c); that Boylan coached litigants to lie in open court, *id.* at ¶ 4; that Boylan systemically corrupted a governmental function by reducing traffic fines and penalties which would not otherwise have been reduced, *see id.;* and that Boylan improperly used his position as a public servant for his own personal benefit, *i.e.,* to solicit sexual favors, and to the detriment of some female litigants and the citizens of Jersey City generally, *see id.* at ¶¶ 3, 5.

As compared to section 2C1.7, the relative inadequacy of section 2F1.1 as a guideline for Boylan's conduct as charged in the Information, is confirmed by looking at the text of section 2F1.1, in particular the factual situations which it does not specifically embrace. For example, Application Note 10 to section 2F1.1 provides that an upward departure may be warranted in certain situations, for example where:

> a primary objective of the fraud was non-monetary; or the fraud caused or risked reasonably foreseeable, substantial non-monetary harm;
>
> the offense caused a loss of confidence in an important institution

U.S.S.G. § 2F1.1, comment. (n.10). Thus, it is clear that the commentary to section 2F1.1 acknowledges that this particular guideline does not, by its terms, embrace much of Boylan's conduct as charged in the Information. That is to say, the "the loss determined by [section 2F1.1](b)(1) does not fully capture the harmfulness and seriousness of the [offense] conduct." *Id.* Furthermore, the commentary to section 2F1.1 acknowledges that conduct alleged as fraudulent may be more aptly covered by a guideline other than section 2F1.1. *See id.,* comment. (n.13). Thus, because section 2C1.7 embraces far more of the conduct charged in the Information than does section 2F1.1 and because section 2F1.1 is plainly inappropriate to capture the conduct charged in the Information, section 2C1.7 is the more applicable of the two guidelines.

The arguments advanced by Boylan in favor of an application of section 2F1.1 are without merit. His first argument is that the application of 2C1.7 improperly considers relevant conduct, within the meaning of section 1B1.3. Rather than point out what conduct not charged in the Information would be considered in applying section 2C1.7, Boylan simply points to as many references to a "scheme to defraud the City of Jersey City, the citizens of Jersey City, and municipal court defendants of money and property" as

---

5. Even if the financial fraud and the honest services fraud were so related, section 2F1.1 would apply only "if the resulting offense level is greater than that determined [by the operation of section 2C1.7(a–b) ]." U.S.S.G. § 2C1.7(c)(1). In this case, the resulting offense level under section 2F1.1 would be, were the stipulations contained in the plea agreement accepted by the Court, 11 (a base offense level of 6, plus a 3–level adjustment for a loss of more than $10,000, plus a 2– level adjustment for more than minimal planning). *See* Plea Agreement, Sch. A at ¶¶ 1–3. The resulting offense level under section 2C1.7, as I calculate it, is 18. Thus, even if the cross-reference contained in section 2C1.7(c)(1) were applicable because the "offense was committed for the purpose of facilitating the commission of another criminal offense," section 2C1.7 would still apply.

he can, *see, e.g.,* Information at ¶ 3, in an attempt to restyle the offense as one exclusively related to money and property. *See, e.g.,* Letter from Michael Critchley 5 (dated Apr. 29, 1998) (hereinafter Critchley 4/29/98 Letter); Letter from Michael Critchley 2–3 (dated Apr. 10, 1998) (hereinafter Critchley 4/10/98 Letter). This ignores the fact that the Information clearly includes in the charged conduct many acts which are embraced only by section 2C1.7, as I have already explained.[6]

 Boylan next argues that he was not charged with a violation of 18 U.S.C. § 1346, and that this fact somehow militates against the application of section 2C1.7. Critchley 4/29/98 Letter at 5; Critchley 4/10/98 Letter at 2, 5. 18 U.S.C. § 1346 does not, however, provide for a criminal offense; it merely provides a definition of "scheme or artifice to defraud" as that term is used in other criminal statutes. Indeed, Appendix A to the Sentencing Guidelines does not even include an applicable offense guideline for a "violation" of 18 U.S.C. § 1346, explicitly recognizing that honest services fraud is generally punishable through 18 U.S.C. §§ 1341, 1343. Thus, the fact that the Information did not include the magic words "to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, does not mean that section 2C1.7 does not apply. What is much more important is that the conduct charged in the Information clearly and unequivocally describes, among other things, a "scheme or

artifice to deprive another of the intangible right of honest services."

] Boylan next argues that application of section 2C1.7 would "undermine the agreement [into] which the Government and Mr. Boylan entered" and would "also destroy Mr. Boylan's reasonable expectations of the appropriate guideline." Critchley 5/10/98 Letter at 3. This argument is without merit since Boylan knew, as he acknowledged at the time of his guilty plea, that among other things: (1) his sentence was within the sole discretion of the sentencing judge; and (2) the agreement to stipulate incorporated in the Plea Agreement "[could not and did] not bind the sentencing court, which may make independent factual findings and may reject any or all of the stipulations entered into by the parties." Plea Agreement at 2; *see also* Transcript at 1014. Moreover, Boylan knew that the sentence under the Sentencing Guidelines could not be determined until after certain information had been gathered and the PSI prepared, and that the Court could impose the maximum term of imprisonment consistent with the Sentencing Guidelines. *Id.* at 10–11, 13.

 Finally, Boylan invites a downward departure "to give effect to [the] Plea Agreement" and asserts without explanation that "the Plea Agreement's stipulations reflect the seriousness of Mr. Boylan's crime and deter future conduct." Critchley 4/29/98 Letter at 6–7. Even if I did have the power to depart downward "to give effect to [the] Plea Agreement,"[7] I do not believe that the

---

6. Boylan does point in one footnote of his submissions to relevant conduct which was described in the PSI. *See* Critchley 4/10/98 Letter at 4 n. 1. I do not adopt the analysis which the Probation Department employed in recommending section 2C1.7 over 2F1.1. As noted above, in selecting the applicable guideline, I have looked only to the conduct charged in the Information. Thus, I reject Boylan's assertion that solicitation of sexual favors from certain municipal court litigants—which *was* charged in the Information, *see* Information at ¶ 5—may not be considered in choosing the applicable guideline section. *See* Critchley 4/29/98 Letter at 5 (asserting that "sexual solicitation activity was actually relevant conduct, which should not have been used by the Probation Office to select the applicable guideline").

7. Boylan cites *United States v. Fernandez,* 877 F.2d 1138 (2d Cir.1989), decided at the dawn of

Sentencing Guidelines jurisprudence, in support of the proposition that a sentencing court can depart downward "to give effect" to a plea agreement with the Government. The holding of *Fernandez* seems also to be that "a district court presented with a plea agreement retains discretion to depart so long as the sentence that results reflects the seriousness of the crime and deters future misconduct." *Id.* at 1145. However, it is far from likely that a mere plea agreement is a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)); *see, e.g., United States v. Dukes,* 936 F.2d 1281, 1283 (D.C.Cir. 1991).

Plea Agreement reflects the seriousness of Boylan's conduct because, as shown above, it does not capture many aspects of the conduct charged in the Information. Accordingly, even if a downward departure were possible, Boylan would not be entitled to such a departure to bring the terms of his sentence in line with his expectations, had the Plea Agreement been accepted in its entirety by the Court.

 Turning now to the exception provided for in section 1B1.2(a), even if section 2C1.7 did not describe more of Boylan's conduct, as charged in the Information, than section 2F1.1 does, the plea, as embodied in the Plea Agreement and in the transcript of the plea colloquy, "contains a stipulation that specifically establishes," U.S.S.G. § 1B1.2(a), the elements of honest services fraud embraceable by section 2C1.7 in addition to a mere financial fraud embraced by section 2F1.1. The elements of wire fraud are: 1) a scheme or artifice to defraud; 2) knowing and willful participation by the defendant in the scheme with the specific intent to defraud, in the particular scheme charged; and 3) use of the wires in furtherance of the scheme to defraud or incident to an essential part of the scheme. *See, e.g., United States v. Frey*, 42 F.3d 795, 797–98 (3d Cir.1994) (noting relationship between elements of wire fraud and mail fraud); *accord United States v. Bissell*, 954 F.Supp. 841, 860 (D.N.J.1996), *aff'd*, 142 F.3d 429 (3d Cir.1998) (not available on Westlaw); *see also United States v. Altman*, 48 F.3d 96, 101 (2d Cir.1995). Pursuant to 18 U.S.C. § 1346, as the term is used in the wire and mail fraud statutes, " 'a scheme or artifice to defraud' includes a scheme or artifice to defraud another of the intangible right of honest services."

While the exact scope of the "intangible right of honest services" has not been well-defined, it clearly includes Boylan's breaches of fiduciary duty as a municipal court judge to the citizens of Jersey City and the victimized municipal court defendants. The conduct to which Boylan, then a municipal court judge, admitted under oath on the record having engaged in over a period of approximately three years included: coaching litigants to lie in open court; reducing traffic

fines and penalties based on those lies; soliciting sexual favors from defendants whose fines and penalties were corruptly reduced; a wire transmission in furtherance of the scheme; and that he knowingly and willfully engaged in this conduct. *See* Transcript at 18–19; *see, e.g., Bissell*, 954 F.Supp. at 862 (noting wide scope of mail fraud statute, as extended by amended section 1346); *see generally United States v. Sawyer*, 85 F.3d 713, 723–25 (1st Cir.1996) (noting that "undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services"); *United States v. Grandmaison*, 77 F.3d 555, 566–67 (1st Cir.1996) (section 1346 includes "efforts by public officials ... to conceal their fraudulent acts from the public 'by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct' "). The crime of honest services fraud is clearly, specifically, and unequivocally established by the stipulations contained in the Plea Agreement and by the admissions made by Boylan under oath as part of the plea colloquy. Accordingly, even if section 2C1.7 were not the more applicable offense guideline and despite the fact that the term "honest services" was not included in the Information, the limited exception contained in section 1B1.2(a) would still require that section 2C1.7 be applied.

### 4. Specific Offense Characteristics

 Having determined that section 2C1.7 is the applicable guideline and that the base offense level is 10, I must decide which of the specific offense characteristics applies. I find that the adjustment under section 2C1.7(b)(1)(B) applies. Specifically, it provides that:

> If the offense involved an elected official or any official holding a highlevel decision-making or sensitive position, increase by 8 levels.

U.S.S.G. § 2C1.7(b)(1)(B). This subsection applies if it is the greater of the adjustments. *Id.* at § 2C1.7(b)(1). An " 'official holding a high-level decision-making or sensitive position' includes ... judges." *Id.* at § 2C1.7, comment. (n.2). Thus, the 8–level adjustment squarely applies to Boylan who was a

municipal court judge at the time of the offense conduct.

### B. Victim–Related Adjustments

■ In its initial objections to the PSI, the Government asserted that a 2 or 3–level adjustment under section 3A1.1 was appropriate. *See* Letter from Ralph J. Marra, Jr. (dated Apr. 13, 1998). In a subsequent letter, the Government stepped back from the 3–level adjustment, and asserted that only the 2–level adjustment is appropriate. *See* Letter from Ralph J. Marra, Jr. 2 n. 1 (dated May 1, 1998). For the reasons that follow, I find that a 2–level adjustment under section 3A1.1(b) is appropriate.

■ Section 3A1.1 provides in relevant part:

(a) If ... in the case of a plea of guilty ..., the court at sentencing determines *beyond a reasonable doubt* that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person, increase by 3 levels.

(b) If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

U.S.S.G. § 3A1.1 (emphasis added). Application Note 1 provides that the first enhancement "applies to offenses that are hate crimes." *Id.* at § 3A1.1, comment. (n.1). The two adjustments are not listed in the disjunctive and thus, it appears that both can apply to a given set of facts. *See, e.g., United States v. Sheldon,* 107 F.3d 868, 1997 WL 79919, *1 (4th Cir. Feb.26, 1997) (finding that both enhancements under section 3A1.1 applied because defendant selected victims based on race and isolated location of victims' home).

While Boylan pled guilty to conduct which involved fraudulently reducing the traffic fines and penalties for exclusively female municipal court defendants, *see, e.g.,* Transcript at 18; Information at ¶ 4, and while Boylan may have generally chosen "single, poor, Hispanic or light-skinned black females," PSI at p. 21, it does not appear beyond a reasonable doubt that the primary motivation for the offense was a hatred of the municipal court defendants. *See* U.S.S.G. § 3A1.1, comment. (backg'd).[8] Thus, because the offense of conviction was not a hate crime, the 3–level adjustment does not apply.

■ However, under subsection (b), the 2–level adjustment is appropriate. Boylan chose victims based on his perception of their economic status and whether they needed someone to "tak[e] care" of them, *i.e.,* whether they were single and poor. *See* PSI at ¶ 21 & p. 21.

■ Boylan makes two arguments with respect to the application of the vulnerable victim adjustment. First, he argues that it would be impermissible double-counting to employ the vulnerable victim adjustment in conjunction with section 2C1.7. The second—which I address below—is that it would be impermissible double-counting to apply both the abuse of trust adjustment and the vulnerable victim adjustment. Boylan's argument with respect to the use of the vulnerable victim adjustment in conjunction with section 2C1.7 is this:

[I]f the women here were vulnerable victims it was because of Mr. Boylan's very position as a judge. The women were vulnerable because they were appearing before Mr. Boylan in his capacity as a judge. Therefore, vulnerable victim would apply in this case solely because Mr. Boylan was a judge; yet, the same reasons and conduct, Mr. Boylan's position as a judge,

---

**8.** Query whether there is a distinction between "intentional[ ] select[ion of] victims ... as the object of the offense ... because of ... gender," U.S.S.G. § 3A1.1(a), and being "primar[ily] motivat[ed by] ... gender." *Id.* at § 3A1.1, comment. (backg'd). For example, imagine a defendant who works in a women's clothing store and accordingly only chooses women to defraud of money. Despite this pattern of victim selection, the defendant may be primarily motivated by greed, not by gender.

would also form the basis for Mr. Boylan's eight level increase under [section] 2C1.7. Critchley 4/10/98 Letter at 8.

This argument is little more than a self-serving tautology and is without merit. To accept it would result in an application of the Sentencing Guidelines which wholly ignores Boylan's conduct: the fact that in this case he consciously chose his victims based on their unusual vulnerability. The 8–level increase under section 2C1.7(b)(1)(B) and the 2–level increase under section 3A1.1(b) both apply because they capture entirely separate and distinct aspects of Boylan's conduct, and do not result in impermissible double-counting. The 8–level increase captures the fact that Boylan held a specific position as a judge. The 2–level increase captures the fact that Boylan chose specific victims based on his perceptions of their family and economic circumstances. The first could easily apply with or without the second. For example, Boylan could have committed the offense in his position as a municipal judge, but could have chosen his victims randomly or on the basis of which female municipal court defendants he considered most physically attractive or sexually appealing. The women were not unusually vulnerable because Boylan was a judge, rather they were unusually vulnerable because Boylan selected them on the basis of certain characteristics.[9] Because the two adjustments are not based on the same facts or conduct, no impermissible double-counting results from the application of both sections 2C1.7(b)(1)(B) and 3A1.1(b). Therefore, given a base offense level of 10 and an

adjustment of 8 levels under section 2C1.7(b)(1)(B) and 2 levels under section 3A1.1(b), Boylan's adjusted offense level is 20.

## C. Abuse of Position of Trust or Use of Special Skill

Because I have held that U.S.S.G. § 2C1.7 applies, rather than U.S.S.G. § 2F1.1, I need not decide whether, as a factual or legal matter, the abuse of trust or use of special skill adjustment applies. This is because section 2C1.7 specifically provides that the abuse of trust or use of special skill adjustment shall not apply, "except where the offense level is determined under [section] 2C1.7(c)(1), (2), or (3)." U.S.S.G. § 2C1.7, comment. (n.4). Since the offense level is not determined under any of these subsections, the abuse of position of trust or use of special skill adjustment is not applicable. Accordingly, I need not address Boylan's objection that it would be impermissible double-counting to apply both the abuse of trust adjustment and the vulnerable victim adjustment. See Critchley 4/29/98 Letter at 8–10.

## D. Fine

 Given Boylan's financial circumstances as described in the PSI and as supplemented by Boylan, see Critchley 4/10/98 Letter at 9–10, I find that Boylan is unable to pay a fine and is not likely to become able to pay any fine in the future. See U.S.S.G. § 5E1.2(a). Accordingly, no fine is appropriate in this case.[10]

9. This is not to suggest that Boylan's unsavory and corrupt scheme did not succeed based in part on his being a judge. Indeed, it is likely that his holding a position of power and the ability to reduce fines and penalties contributed greatly to his victims' willingness to engage in sexual conduct with him. However, it is equally likely that the success of Boylan's scheme was the result of his selection of unusually vulnerable victims. In any event, the Sentencing Guidelines do not generally call for a sentencing court to look at the reasons for a particular crime's success or failure. Rather, the Guidelines focus on conduct and its consequences.

10. I do not address the amount of restitution in this Opinion except to note how I shall calculate that amount. Under the Mandatory Victims Restitution Act of 1996 (the "MVRA"), Pub.L. No,

104–321, 110 Stat. 1214, restitution "in the full amount of each victim's losses as determined by the court" is mandatory and shall be ordered "without consideration of the economic circumstances of the defendant." See 18 U.S.C. § 3664(f)(1)(A); see also 18 U.S.C. § 3663A(a)(1). The Court may, however, take into account ability to pay in considering "the manner in which and the schedule according to which, the restitution is to be paid." See 18 U.S.C. § 3664(f)(2)(A–C) (listing factors court should consider as "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled," "projected earnings and other income of the defendant," and "any financial obligations of the defendant, including obligations to dependents"); see also 18 U.S.C. § 3664(f)(3)(A) (discussing circumstances under which nominal periodic payments may be or-

### E. Diminished Capacity

While several psychological and psychometric reports prepared by doctors and submitted as part of the PSI might have supported a motion for a downward departure based on diminished mental capacity pursuant to U.S.S.G. § 5K2.13, Boylan has declined to move for a downward departure on that basis. *See* Certification of James F. Boylan ¶ 6 (dated Apr. 28, 1998). Boylan has, however, selected one of the reports as support for his argument that he should be sentenced at the low end of the applicable guideline range. *See* Critchley 4/29/98 Letter at 12. I do not address in this Opinion where within the applicable guideline range Boylan should be sentenced.

### II. Conclusion

Therefore, with a base offense level of 10 under section 2C1.7(a), an 8–level enhancement under section 2C1.7(b)(1)(B), a 2–level adjustment pursuant to section 3A1.1(b), and a 3–level downward adjustment based on acceptance of responsibility under section 3E1.1, as contained in the Plea Agreement, *see* Plea Agreement, Sch. A at ¶ 4, no criminal history points, and a criminal history category of I, the total offense level is 17 and the applicable guideline range is 24–30 months.

dered); U.S.S.G. § 5E1.1; *see generally United States v. Golino*, 956 F.Supp. 359, 365–66 (E.D.N.Y.1997) (Weinstein, J.).